No. 24-3236

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

---

JAY ASHCROFT, in his official capacity as Secretary of State for the State of Missouri, *et al.*,

*Plaintiffs-Appellants*,

v.

JOSEPH BIDEN, in his official capacity as President of the United States, *et al.*,

*Defendants-Appellees*.

---

## OPPOSITION TO PLAINTIFFS-APPELLANTS'
## MOTION FOR INJUNCTION PENDING APPEAL

---

BRIAN M. BOYNTON
*Principal Deputy Assistant
Attorney General*

DANIEL TENNY
JEFFREY E. SANDBERG
*Attorneys, Appellate Staff
Civil Division, Room 7214
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 532-4453*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........................................................... 1

STATEMENT ...................................................................................... 3

    A.    The Executive Order ...................................................... 3

    B.    This Litigation .............................................................. 5

ARGUMENT ....................................................................................... 7

    A.    There is No Emergency Warranting This Court's Immediate
          Action. ........................................................................ 8

    B.    Plaintiffs Have Not Made The Requisite Showing Of Standing...... 10

    C.    Plaintiffs Have Not Shown A Likelihood Of Success On The
          Merits. ....................................................................... 13

    D.    Plaintiffs Cannot Satisfy The Remaining Requirements For
          Emergency Relief. ....................................................... 20

CONCLUSION ................................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                    **Page(s)**

*Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of HHS,*
   17 F.4th 793 (8th Cir. 2021) ................................................................ 21

*America First Legal Found. v. U.S. Dep't of Agric.,*
   No. 22-cv-3029, 2023 WL 4581313 (D.D.C. July 18, 2023),
   *appeal pending,* No. 23-5173 (D.C. Cir.) (arg't held Sept. 5, 2024)................. 4

*Benisek v. Lamone,*
   585 U.S. 155 (2018) ........................................................................ 21

*Building & Const. Trades Dep't, AFL-CIO v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002) ............................................................. 14

*California v. EPA,*
   72 F.4th 308 (D.C. Cir. 2023) ............................................................ 15

*Chen Zhou Chai v. Carroll,*
   48 F.3d 1331 (4th Cir. 1995) .............................................................. 15

*Chiafalo v. Washington,*
   591 U.S. 578 (2020) ........................................................................ 16

*Department of Homeland Sec. v. New York,*
   140 S. Ct. 599 (2020) ...................................................................... 22

*Gill v. Whitford,*
   585 U.S. 48 (2018) ......................................................................... 22

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor,*
   510 U.S. 1301 (1993) ....................................................................... 22

*Louisiana ex rel. La. Dep't of Wildlife & Fisheries v. National Oceanic &*
   *Atmospheric Admin.,*
   70 F.4th 872 (5th Cir. 2023) .............................................................. 12

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ........................................................................ 22

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ........................................................................ 11

*Missouri v. Biden*,
   112 F.4th 531 (8th Cir. 2024) (per curiam) ................................................... 8

*Moore v. Harper*,
   600 U.S. 1 (2023) ..................................................................................... 16

*Murphy v. National Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018) ................................................................................. 16

*Myers v. United States*,
   272 U.S. 52 (1926).............................................................................. 14, 15

*Ng v. Board of Regents of Univ. of Minnesota*,
   64 F.4th 992 (8th Cir. 2023) ..................................................................... 21

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................. 21

*Norton v. Southern Utah Wilderness All.*,
   542 U.S. 55 (2004) .................................................................................. 18

*Novus Franchising, Inc. v. Dawson*,
   725 F.3d 885 (8th Cir. 2013)..................................................................... 20

*Organization for Black Struggle v. Ashcroft*,
   978 F.3d 603 (8th Cir. 2020) ...................................................................... 8

*Padda v. Becerra*,
   37 F.4th 1376 (8th Cir. 2022) ................................................................... 21

*Printz v. United States*,
   521 U.S. 898 (1997) ................................................................................. 16

*Respect Maine PAC v. McKee*,
   562 U.S. 996 (2010) (per curiam).......................................................... 1, 8

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020) (per curiam).......................................................... 7, 8

*Shrink Mo. Gov't PAC v. Adams*,
   151 F.3d 763 (8th Cir. 1998)..................................................................7, 20

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   446 F.3d 808 (8th Cir. 2006)..................................................................... 18

*United States v. Texas*,
  599 U.S. 670 (2023)........................................................................ 12

*Winter v. Natural Resources Def. Council, Inc*,
  555 U.S. 7 (2008) ........................................................................... 13

**Constitution:**

U.S. Const. art. I, § 4, cl. 1............................................................... 16

U.S. Const. art. II, § 1, cl. 1 ............................................................. 14

**Statutes:**

5 U.S.C. §§ 7321-7326 .................................................................... 19

52 U.S.C. § 20501(a)(1)-(2) ............................................................... 1

**Other Authorities:**

Exec. Order No. 13,279 (Dec. 12, 2002)......................................... 15

Exec. Order No. 13,798 (May 4, 2017) .......................................... 15

Exec. Order No. 13,990 (Jan. 20, 2021) ........................................ 15

Exec. Order No. 14,019 (Mar. 7, 2021) ...................................*passim*

White House, *Fact Sheet: The Biden-Harris Admin. Continues to Promote Access to Voting* (Mar. 5, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/05/fact-sheet-the-biden-harris-administration-continues-to-promote-access-to-voting/ ......................... 5, 19

White House, *Fact Sheet: Biden-Harris Admin. Releases Rep. on Native Am. Voting Rights* (Mar. 24, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/03/24/fact-sheet-biden-harris-administration-releases-report-on-native-american-voting-rights/ ................ 5

White House, *Fact Sheet: Biden Administration Promotes Voter Participation with New Agency Steps* (Sept. 28, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/28/fact-sheet-biden-administration-promotes-voter-participation-with-new-agency-steps/ .....5, 19

## INTRODUCTION AND SUMMARY

Plaintiffs have not demonstrated an entitlement to an emergency injunction pending appeal in their sprawling challenge to a 2021 Executive Order that merely directs federal agencies to exercise their own authorities consistent with applicable law. The district court properly held that plaintiffs had not established Article III standing, much less sufficient irreparable harm to justify a preliminary injunction. Their application for injunctive relief on appeal "demands a significantly higher justification than a request for a stay," *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010) (per curiam) (quotation marks omitted), and plaintiffs have not come close to meeting that burden.

The Executive Order at issue was issued years ago. In March 2021, shortly after taking office and consistent with prior efforts to fulfill "the duty of the Federal . . . government[] to promote the exercise of" the "fundamental right" to vote, 52 U.S.C. § 20501(a)(1)-(2), President Biden issued an order reiterating that it is the "responsibility of the Federal Government to expand access to, and education about, voter registration and election information." Exec. Order No. 14,019, 86 Fed. Reg. 13,623 (Mar. 7, 2021) (EO 14019). As relevant here, EO 14019 directed agencies to brainstorm ways that they can "promote voter registration and voter participation," but made explicit that they should do so only "as appropriate and consistent with applicable law."

EO 14019, § 3(a).  In turn, over the past several years, agencies have endeavored to take various actions to help disseminate nonpartisan voting information to the public, including (as one common example) by linking to Vote.gov on their respective agency websites.

Some three-and-a-half years later, and despite the explicitly nonpartisan nature of agencies' efforts and their conscious adherence to all federal and state laws, plaintiffs filed these actions in July 2024 against the President and fifteen different federal agencies.  Rather than challenging concrete agency actions that they believe exceeded the agencies' authorities, they seek to attack the Executive Order itself (which, as noted, directs agencies to consider the limits on their own authority).  Then, after waiting eight more weeks, plaintiffs suddenly demanded that the district court proceed in expedited fashion to consider their request for a preliminary injunction against virtually the entire Executive Branch, offering no justification for emergency relief other than the imminence of a long-scheduled election.  After expedited briefing and oral argument, the district court denied that injunction on the ground that plaintiffs failed at the threshold even to establish their standing to sue.  Plaintiffs now renew their last-minute request in this Court via motion for injunction pending appeal, which they filed on the literal eve of the election (Monday, November

4).  Plaintiffs also sought a temporary administrative injunction, which this
Court denied that same day.

Plaintiffs' motion should be denied.  The election that ostensibly
motivated plaintiffs' request for emergency relief has now passed, as have all
conceivably relevant deadlines for voter registration.  Plaintiffs make no
serious effort to explain why emergency relief is necessary, and that fact alone
warrants denial of their motion.  In any event, the district court correctly held
that plaintiffs have failed to establish the necessary Article III standing to
justify consideration of their request for injunctive relief, and they are unlikely
to succeed on the merits of their claims in all events.  Plaintiffs also cannot
satisfy any of the other requirements for equitable relief.

## STATEMENT

### A.    The Executive Order

In March 2021, President Biden issued EO 14019, entitled "Promoting
Access to Voting."  The President declared that "[i]t is the policy of [his]
Administration to promote and defend the right to vote for all Americans who
are legally entitled to participate in elections."  *Id.* § 2.  And, in furtherance of
that policy, the EO directed federal agencies to "consider ways to expand
citizens' opportunities to register to vote and to obtain information about, and
participate in, the electoral process."  *Id.* § 3.  As relevant here, the head of

each federal agency was directed to "evaluate ways in which the agency can, as appropriate and consistent with applicable law, promote voter registration and voter participation." *Id.* § 3(a). In particular, the EO directed each agency to consider ways that it has authority to: "provide relevant information . . . about how to register to vote, how to request a vote-by-mail ballot, and how to cast a ballot in upcoming elections"; "facilitate seamless transition from agencies' websites directly to State online voter registration systems or appropriate Federal websites, such as Vote.gov"; "provide access to voter registration services and vote-by-mail ballot applications"; "promote and expand access to multilingual voter registration and election information"; and "promote equal participation in the electoral process for all eligible citizens of all backgrounds." *Id.* § 3(a)(i)-(iv). The EO required each agency to submit to the Assistant to the President for Domestic Policy, within 200 days, "a strategic plan outlining the ways identified . . . that the agency can promote voter registration and voter participation." *Id.* § 3(b).

Many, but far from all, of the initiatives proposed by the agencies were selected for implementation. *See America First Legal Found. v. U.S. Dep't of Agric.*, No. 22-cv-3029, 2023 WL 4581313, at *7 (D.D.C. July 18, 2023), *appeal pending*, No. 23-5173 (D.C. Cir.) (arg't held Sept. 5, 2024). The White House has released regular announcements concerning the activities that various

agencies are undertaking.[1]  These have included updates to agency websites—such as links to Vote.gov—as well as communications in which, for example, agencies encourage their "field offices to make nonpartisan information about voter registration available in customer service locations" around the country. 2023 White House Fact Sheet.  The agency activities taken under EO 14019 thus reflect agency efforts to find ways to provide the public collectively, across all areas of the country, with nonpartisan information about elections and the voter registration processes established by relevant state law.

## B.    This Litigation

Plaintiffs in this consolidated matter are the State of Missouri, one state official from the State of Arkansas, and Missouri state and local officials suing in their official capacities.  They filed these lawsuits on July 31, 2024 (*Ashcroft*) and August 1, 2024 (*Missouri*), well over three years after the President signed

---

[1] *See, e.g.*, The White House, *Fact Sheet: The Biden-Harris Admin. Continues to Promote Access to Voting* (Mar. 5, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/05/fact-sheet-the-biden-harris-administration-continues-to-promote-access-to-voting/ (2023 White House Fact Sheet); The White House, *Fact Sheet: Biden-Harris Admin. Releases Rep. on Native Am. Voting Rights* (Mar. 24, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/03/24/fact-sheet-biden-harris-administration-releases-report-on-native-american-voting-rights/ (2022 White House Fact Sheet); The White House, *Fact Sheet: Biden Administration Promotes Voter Participation with New Agency Steps* (Sept. 28, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/28/fact-sheet-biden-administration-promotes-voter-participation-with-new-agency-steps/ (2021 White House Fact Sheet).

EO 14019.  In their complaints, Plaintiffs have alleged that the EO uses "federal taxpayer money and resources to fund what is, in all practical effect, a get-out-the-vote and ballot harvesting scheme favoring a select demographic of the electorate that favors President Biden and the Democrat Party."  App. 19 (*Ashcroft* Compl. ¶ 46).[2]  Then, another two months later, plaintiffs sought a preliminary injunction on the theory that the EO "'violates the Separation of Powers, the Elections Clause, the Tenth Amendment, and federalism,'" the Hatch Act, and the Administrative Procedure Act.  App. 2.

Following briefing and oral argument, the district court denied plaintiffs' motion.  App. 1-7.  The court explained that plaintiffs' request failed at the outset because they had not "made a 'clear showing' that they are 'likely' to establish" the required Article III elements of "injury-in-fact or causation." App. 7.  The court acknowledged plaintiffs' contentions that future implementation of EO 14019 would "'impose[] unreimbursed costs and expenses upon States and local election officials'" or undermine their interest in "'assuring that elections are conducted in a fair, honest, and orderly manner that inspires public confidence.'"  App. 4 (quoting Compl. ¶¶ 69, 75).  But plaintiffs failed to support either of those theories.  "Although President Biden signed the EO in March 2021, as of September 2024, Plaintiffs have produced

_____

[2] "App." citations are to the appendix accompanying plaintiffs' motion.

only nonspecific and speculative allegations of increased compliance costs."
App. 5. And, despite claiming that the EO would involve agencies in working
with suspect third-party organizations, plaintiffs did not "specifically allege the
involvement of any third-party organization in implementing the EO" at all,
much less such involvement "that threatens the actual or apparent integrity of
the election." App. 6-7. Plaintiffs also "fail[ed] to allege a causal link between
the EO and any submissions of duplicative or ineligible voter registration
forms or mail-in ballot applications." App. 7.

Plaintiffs appealed, and their opening brief is currently due by December
24, 2024. Plaintiffs moved for an injunction pending appeal (together with a
request for a temporary administrative injunction, which this Court has
already denied) on November 4, 2024, the day before the 2024 election (and
well after voter-registration deadlines in their States).

## ARGUMENT

To obtain the extraordinary remedy of an injunction pending appeal,
plaintiffs must show that their "claims are likely to prevail, that denying them
relief would lead to irreparable injury, and that granting relief would not harm
the public interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14,
16 (2020) (per curiam); *see Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764
(8th Cir. 1998). An injunction pending appeal "demands a significantly higher

justification" than the stay of a court order, as "an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts." *Respect Maine PAC*, 562 U.S. at 996 (quotation marks omitted). Plaintiffs thus must make a "strong showing" that they will prevail on the merits. *Roman Catholic Diocese*, 592 U.S. at 16; *cf. Organization for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) (same for stay).

### A. There is No Emergency Warranting This Court's Immediate Action.

An injunction pending appeal is an equitable remedy, and there is no basis for exercising the Court's discretion to grant that remedy in this case. "In ruling on a request for an injunction pending appeal, the court must engage in the same inquiry as when it reviews the grant or denial of a preliminary injunction." *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024) (per curiam) (quotation marks omitted). Thus, plaintiffs essentially ask this Court to resolve—on limited briefing and in expedited fashion—the merits of the preliminary-injunction appeal itself. But though plaintiffs' motion argues at length about standing (Mot. 7-14) and the purported merits of their claims (Mot. 14-20), they nowhere identify any exigency warranting this Court's immediate attention to those questions.

Plaintiffs emphasize that the date of the general election was November 5, 2024. But that date has now passed, and it is unclear why plaintiffs perceive it as a relevant deadline in any event. Plaintiffs' alleged harms arise from the federal government's encouragement of voter registration and voter participation in advance of the election, not from the conduct of the election itself. In fact, the voter registration deadlines in plaintiffs' States—Arkansas and Missouri—were October 7, 2024 and October 9, 2024, respectively, so any actions taken by federal agencies to encourage voter registration after those dates necessarily could not have affected this year's election. Yet plaintiffs have sought only prospective relief.

Plaintiffs suggest that unspecified "imminent harm . . . will continue" even after the election insofar as "[m]any States allow provisional ballots to be 'cured' and counted during the week following Election Day." Mot. 22. But plaintiffs nowhere explain how the current activities of any—much less all—of the defendant agencies would affect the curing of provisional ballots in their States, assuming any opportunity to cure even remains available under state law. In any event, the pre-certification vote totals are now publicly available for all counties and precincts in both Arkansas and Missouri,[3] and there is no

---

[3] *See* https://www.sos.arkansas.gov/elections/research/election-results; https://enr.sos.mo.gov/.

apparent reason why any federal agency's activities would have any bearing on the integrity or ultimate certification of those results.

**B.    Plaintiffs Have Not Made The Requisite Showing Of Standing.**

Plaintiffs' request for emergency relief may also be denied because they have not met their burden of establishing Article III jurisdiction.  In their motion, plaintiffs reiterate their two theories of standing:  (1) that they face "monetary harms" from having to process additional voter registrations allegedly motivated by EO 14019, *see* Mot. 7-13, or (2) that their "interest in election integrity" is undermined by federal efforts to encourage voter participation, *see* Mot. 13-14.  But as the district court explained, plaintiffs have failed to support either theory.

With respect to the first theory, plaintiffs posit that the purported marginal costs associated with processing any "new voter registration[s] produced by EO 14019" should suffice because the "'loss of even a small amount of money'" can constitute injury.  Mot. 7.  As an initial matter, state election officials do not suffer cognizable injury when they are doing nothing more than performing the ministerial duties of the offices they voluntarily assumed.  But even assuming that increases in voter registration could be cast as injurious to the stewards of our democracy, plaintiffs have failed to substantiate that the EO's implementation will increase their costs.  It is far

from self-evident that efforts by the federal government to provide reliable and accurate information about elections would increase costs to state election officials—rather than reducing them by, for example, limiting the extent to which state officials must field inquiries themselves or by avoiding potential errors in registration.

Plaintiffs did not fill this logical gap through evidence. Rather, "[a]lthough President Biden signed the EO in March 2021, as of September 2024, Plaintiffs have produced only nonspecific and speculative allegations of increased compliance costs." App. 5. Indeed, they do not even "allege a measurable increase in voter registrations overall," much less an increase "in attempted registrations by ineligible persons." *Id.* At most, plaintiffs "predict, rather than allege, increased costs." App. 6; *accord* Mot. 9 (agreeing that "plaintiffs' claims are predictive"). But plaintiffs "provide nothing specific or concrete to support those predictions." App. 6. As plaintiffs themselves concede, to establish standing to seek the prospective relief they demand, "anticipated *future* injuries are necessary." Mot. 10. Yet plaintiffs' predictions of imminent future increases in the cost of processing voter registrations have only become more implausible since the key voter-registration deadlines expired more than a month ago. *See supra* p. 9. And even assuming the "special solicitude" described in *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)

remains relevant despite the Supreme Court's omission of that concept in recent decisions, *see United States v. Texas*, 599 U.S. 670, 688-89 (2023) (Gorsuch, J., concurring in the judgment), that principle "merely changes the normal standards for redressability and immediacy" and "does not absolve States from substantiating a cognizable injury," *Louisiana ex rel. La. Dep't of Wildlife & Fisheries v. National Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 (5th Cir. 2023) (quotation marks omitted).

In addition, showing an increase in costs would not be sufficient, as plaintiffs would also need to demonstrate a "causal connection between an[] action taken pursuant to the EO and [the] increase in costs" they hypothesize. App. 6. As the district court recognized, plaintiffs did not satisfy this burden either. Plaintiffs identified a single incident in which one improper voter registration had occurred, but they never established any "link between that incident" and the agency actions they seek to challenge. *Id.* Indeed, even assuming a federal agency was involved, federal agencies were "engaged in activities promoting voter registration [even] before promulgation of the EO," so plaintiffs have not shown that the challenged EO caused the incident. *Id.*

With respect to the second theory, plaintiffs similarly offer no evidence to support their contention that the EO threatens to impair their "interest in fair, honest, and orderly elections." Mot. 13. Instead, plaintiffs offer only

speculation that federal agencies could "work with third-party organizations," a prospect they fear because "certain third-party organizations have in the past engaged in activities that resulted in improper voter registrations." App. 6. "But Plaintiffs do not specifically allege the involvement of any third-party organization in implementing the EO," much less "allege any third-party action that threatens the actual or apparent integrity of the election." App. 6-7.[4] Their claim that the "'system is ripe for abuse [and] corruption'" (Mot. 14) is the kind of baseless assertion that is insufficient to invoke Article III jurisdiction, much less to justify the extraordinary remedy of an injunction pending appeal.

### C. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits.

Though the district court had no occasion to reach it—and this Court likewise need not do so—plaintiffs also cannot show the requisite likelihood of success on any of their various merits theories. *See Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (requiring plaintiff to establish "that he

---

[4] Plaintiffs' passing suggestion that the EO *requires* federal agencies to work with third-party organizations (Mot. 14) is incorrect. By its plain terms, Section 3 of EO 14019 instructs only that federal agencies "evaluate" and "consider" various potential "ways to provide access to voter registration services and vote-by-mail ballot applications"—among others, "facilitating approved, nonpartisan third-party organizations and State officials to provide voter registration services on agency premises"—but it does not specifically mandate that agencies pursue that particular course. EO 14019, § 3(a)(iii)(C).

is likely to succeed on the merits"); App. 147-160 (addressing at greater length the errors in plaintiffs' various merits claims).

**1.** Plaintiffs rightly do not suggest that this Court would have authority to enjoin the President himself, instead contending that this Court can "compel subordinate executive officials to disobey illegal Presidential commands." Mot. 15 (quotation marks omitted). But this sprawling lawsuit does not identify any unlawful action that a particular agency has been directed to take, instead generally attacking the Executive Order despite its explicit instruction that agencies "consider" taking actions only "as appropriate and consistent with applicable law," EO 14019, § 3(a).

Plaintiffs attempt to evade this obstacle by asserting that the President lacked constitutional and statutory authority to issue the EO. *Cf.* Mot. 15-19. There is no basis for the extraordinary claim that the President lacks authority to give guidance to his subordinates on how to exercise their lawful authorities. The Constitution provides that "[t]he executive Power shall be vested in a President," U.S. Const. art. II, § 1, cl. 1, a power that "necessarily encompasses 'general administrative control of those executing the laws' . . . throughout the Executive Branch of government," *Building & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). Indeed, "faithful execution of the laws

14

enacted by the Congress"—such as the National Voter Registration Act of 1993 (NVRA)—"ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates." *Id.* Not surprisingly, Presidents of both parties have regularly exercised their "general administrative control" to oversee how agency officials carry out their statutory responsibilities within the bounds of their discretion. *See, e.g.*, Exec. Order No. 13,990 (Jan. 20, 2021); Exec. Order No. 13,798 (May 4, 2017); Exec. Order No. 13,279 (Dec. 12, 2002).

The Executive Order here is of the same ilk. The President issued the EO because he wished agencies to consider what nonpartisan actions they could take consistent with various statutory mandates and the general goals of the NVRA. Rather than "create any private rights," the EO operates as part of the "internal management of the executive branch," serving as a "directive[] to agency officials to consider certain policies when making regulatory decisions." *California v. EPA*, 72 F.4th 308, 318 (D.C. Cir. 2023) (quotation marks omitted). This type of presidential instruction is entirely unremarkable and requires no explicit statutory mandate or delegation of congressional authority; it flows from the President's "general constitutional powers to direct . . . executive branch officials." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1339 (4th Cir. 1995); *see Myers*, 272 U.S. at 135 (President "may properly supervise

15

and guide" his subordinates as part of efforts to "secure th[e] unitary and uniform execution of the laws").

**2.** Plaintiffs fare no better in their assertions that the EO contravenes state authority under the Elections or Electors Clauses or the Tenth Amendment. The Elections Clause provides that State legislatures generally may prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congressional direction. U.S. Const. art. I, § 4, cl. 1. The Electors Clause grants State legislatures the right to "define the method" of selecting the Electors who vote for the President, *Moore v. Harper*, 600 U.S. 1, 27 (2023), which States generally exercise by "appoint[ing] a slate of electors selected by the political party whose candidate has won the State's popular vote," *Chiafalo v. Washington*, 591 U.S. 578, 581 (2020). And the Tenth Amendment prohibits the Federal Government from "issu[ing] direct orders to the governments of the States" or "'command[ing] the States' officers . . . to administer or enforce a federal regulatory program.'" *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 471, 473 (2018) (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)).

EO 14019 has nothing to say about any of these matters. It does not purport to set any procedural rule governing when, where, or how citizens may vote in federal congressional or presidential elections, nor does it purport to

16

determine how a State's Electors will be chosen. Rather, the EO directs federal agencies to consider ways that they might be able to assist voters "in completing voter registration and vote-by-mail ballot application forms *in a manner consistent with all relevant State laws*," EO 14019, § 3(a)(iii)(B) (emphasis added), and to evaluate whether "any identity documents issued by the agency . . . can be issued in a form that *satisfies State voter identification laws*," *id.* § 3(a)(v) (emphasis added). The EO thus seeks to facilitate voter participation in the manner that the States themselves have prescribed. Plaintiffs offer nothing to support their baseless assumption that any federal Executive Branch action intended to assist citizens with voting—even one as anodyne as providing accurate information about State voting laws—violates States' authority to superintend their elections.

Plaintiffs also cannot seriously suggest that providing such information runs afoul of the Tenth Amendment. The EO in no way "command[s] a state government to enact" legislation or presses "state officers" into federal service. *Murphy*, 584 U.S. at 472-73 (quotation marks omitted). While the EO references the NVRA, which in turn "requires State officials to do certain acts regarding voter registration," Mot. 17, the NVRA was enacted under Congress's own Elections Clause authority, and plaintiffs do not contend that the NVRA is unconstitutional.

**3.** Plaintiffs also cannot show any likelihood of success on their APA claim. They categorically assert that agencies' "plans to implement EO 14019 are procedurally deficient under the APA," Mot. 18, yet they do not identify a single final agency action that required notice-and-comment rulemaking. Plaintiffs refer to the agencies' strategic plans submitted to the White House in September 2021, but those were deliberative and predecisional inputs into presidential advice, not the operating law of the agencies. More generally, "[a] broad agency program," such as a multifaceted initiative to publicize nonpartisan voting information, "is not a final agency action within the meaning of [the APA]." *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006). The APA does not allow plaintiffs to mount a "broad programmatic attack" on the operations of an entire agency, let alone (as here) on all Executive departments at once. *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

The few specific agencies that plaintiffs even mention—which would not in any event justify the sprawling relief they seek—underscore their failure to identify any agency action that was inconsistent with the APA's requirements. Plaintiffs allude (Mot. 18) to the Department of Agriculture "stat[ing] in letters to state agencies administering nutrition assistance programs that it was 'encouraging all USDA agency field offices to make nonpartisan information

about voter registration available in customer service locations' around the country," without explaining why such letters of encouragement would have legal consequences that would require notice-and-comment rulemaking. App. 139 (quoting 2023 White House Fact Sheet). And their reference to a news article about the Department of Housing and Urban Development appears to refer, at bottom, to a "letter to Executive Directors that provides useful information to [public housing authorities] about permissible ways to inform residents of non-partisan voter registration information and services"—again, an informational letter with no legal effect. 2021 White House Fact Sheet.

**4.** Finally, though they do not develop the argument, plaintiffs' oblique suggestion of possible violations of the Hatch Act—which generally restricts partisan political activity by federal employees, *see* 5 U.S.C. §§ 7321-7326—are equally wide of the mark. *Cf., e.g.*, Mot. 1 (asserting that EO 14019 "directs federal agencies to perform partisan campaign activities"). By its plain terms, the EO is strictly *non*partisan. It announces the general purpose of "expand[ing] access to, and education about, voter registration and election information . . . in order to enable *all* eligible Americans to participate" in elections, EO 14019, § 2, and consistent with that purpose, directs agencies to "evaluate ways in which [they] can, *as appropriate and consistent with applicable law*, promote voter registration" in the course of their activities, *id.* § 3(a)

(emphasis added); *see also id.* § 12(b) (requiring that EO "be implemented consistent with applicable law"). No provision of federal law—and thus no provision of the EO—directs or allows agencies to utilize their resources for the purposes of benefitting a particular party or campaign, and plaintiffs offer no evidence to suggest that agencies' efforts under the EO have attempted to target any group based on partisanship or to provide a partisan advantage.

### D. Plaintiffs Cannot Satisfy The Remaining Requirements For Emergency Relief.

Finally, plaintiffs cannot satisfy any of the remaining requirements for entry of an emergency injunction pending appeal. *See Shrink Mo. Gov't PAC*, 151 F.3d at 764 (also requiring showing of a "likelihood of irreparable injury," "the absence of any substantial harm to other interested parties if an injunction is granted," and "the absence of any harm to the public interest").

**1.** Plaintiffs fail to show the requisite irreparable harm. *See Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (requiring harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief") (quotation marks omitted). Plaintiffs assert that any compliance costs they would incur traceable to EO 14019 are "not recoverable" and so would qualify as irreparable harm (Mot. 20), but as the district court explained, they have wholly failed to substantiate such costs. And plaintiffs offer no support at all for their assertion (*see id.*) that EO 14019

somehow operates to prevent the implementation of duly enacted state statutes. Such "vague and speculative" assertions fall well short of showing irreparable harm. *Padda v. Becerra*, 37 F.4th 1376, 1384 (8th Cir. 2022).

The absence of irreparable harm is underscored by plaintiffs' still-unexplained delay in seeking relief. "[A] party requesting a preliminary injunction must generally show reasonable diligence," *Benisek v. Lamone*, 585 U.S. 155, 159 (2018), and "delay may belie the claim of an irreparable injury before trial if it is unreasonable," *Ng v. Board of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023). Here, the EO was issued in March 2021, and information about agency efforts to implement it has been available for years. *Cf. supra* p. 5 n.1. But plaintiffs did not file suit until July 2024, and even then, did not seek an injunction until September 2024. This "long delay by plaintiff[s] after learning of the threatened harm" is properly "taken as an indication that the harm [is not] serious enough to justify" emergency relief. *Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of HHS*, 17 F.4th 793, 805 (8th Cir. 2021) (quotation marks omitted).

**2.** The remaining two factors likewise weigh against an injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (factors merge when government is a party). An injunction here would frustrate not only the public's interest in obtaining access to accurate voting information, but also its interest in ensuring

the President's ability to exercise constitutional oversight over his unelected subordinates. Those harms are particularly significant because they would represent "not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers).

**3.** Finally, assuming *arguendo* any relief were appropriate, both constitutional and equitable principles would require that it be no broader than necessary to remedy any demonstrated irreparable harm to these plaintiffs. *See, e.g.*, *Gill v. Whitford*, 585 U.S. 48, 73 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Universal relief is irreconcilable with these limitations and creates other practical and legal problems, *see, e.g.*, *Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J., concurring), including pretermitting other challenges involving EO 14019 that are pending in courts around the country. Plaintiffs' motion does not argue that universal relief is necessary to redress their claimed injuries, and this Court should not afford such sweeping relief, either.

# CONCLUSION

For the foregoing reasons, plaintiffs' motion for injunction pending appeal should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

DANIEL TENNY
*/s/ Jeffrey E. Sandberg*

JEFFREY E. SANDBERG
*Attorneys, Appellate Staff*
*Civil Division, Room 7214*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4453*
*jeffrey.e.sandberg@usdoj.gov*

*Counsel for Defendants-Appellees*

NOVEMBER 2024

**CERTIFICATE OF COMPLIANCE**

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,922 words. This response also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Jeffrey E. Sandberg*

Jeffrey E. Sandberg
*Counsel for Defendants-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2024, I electronically filed the foregoing response with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey E. Sandberg*

Jeffrey E. Sandberg
*Counsel for Defendants-Appellees*